1
2
3
4                       UNITED STATES DISTRICT COURT
5                     NORTHERN DISTRICT OF CALIFORNIA
6
7    YASMIN KULLAB,                              Case No.  24-cv-04140-WHO
8                  Plaintiff,
9         v.                                    **ORDER GRANTING MOTION FOR
                                                SUMMARY JUDGMENT**
10   UNITED STATES DEPARTMENT OF                 Re: Dkt. No. 13
     HOMELAND SECURITY, et al.,
11                Defendants.
12
13        Plaintiff Yasmin Kullab ("Kullab") filed an asylum application with the United States
14   Department of Citizenship and Immigration Services ("USCIS") on November 3, 2020.  To date,
15   Kullab's application has not been adjudicated, and she has not yet been contacted for her asylum
16   interview.  Kullab filed this action against USCIS, the United States Department of Homeland
17   Security ("DHS"), and three individuals—Alejandro Mayorkas ("Mayorkas"), Ur M. Jaddou
18   ("Jaddou"), and Emelia Bardini ("Bardini")—in their official capacities (together "defendants").
19   Under both the Mandamus Act ("Mandamus") and the Administrative Procedures Act ("APA"),
20   Kullab claims that the adjudication of her application has been unreasonably delayed and requests
21   an order compelling adjudication.  Defendants move for summary judgment on both causes of
22   action, arguing that this court does not have jurisdiction to review Kullab's claims but, even if it
23   did, the claims fail because USCIS has not unreasonably delayed adjudication.  While I conclude
24   that I have jurisdiction, and the delay in adjudication is unquestionably long, I cannot find that it is
25   unreasonably long—yet.  For the following reasons, the defendants' motion is GRANTED.

26                              **BACKGROUND**
27   I.    **USCIS HISTORY AND PROCEDURES**
28        Under the Immigration and Nationality Act ("INA"), "Any alien who is physically present

United States District Court
Northern District of California

in the United States or who arrives in the United States . . . , irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1). The INA gives the Attorney General (and the Secretary of Homeland Security) the discretion to establish procedures for considering asylum applications. 8 U.S.C. § 1158(d)(1). The INA does provide guidelines and rules for adjudicating asylum applications, however. *See* 8 U.S.C. § 1158(d)(5)(A). For example, "in the absence of exceptional circumstances," asylum interviews shall be held within 45 days of an application's filing, and the application shall be fully adjudicated within 180 days of filing. 8 U.S.C. § 1158(d)(5)(A)(ii)–(iii). Further, the INA expressly prohibits private substantive or procedural rights of action. 8 U.S.C. § 1158(d)(7).

Prior to 1995, as a standard practice, the Immigration and Naturalization Service ("INS") issued employment authorization to nonfrivolous applicants whose asylum application was not adjudicated in 90 days. Declaration of John L. Lafferty, Dkt. No. 13-1 ¶ 9. Because most applications were not adjudicated in 90 days, INS began mailing employment authorization documents ("EAD") to applicants upon receipt of their applications. *Id.* ¶ 9. This practice, however, spiked the number of frivolous asylum applications, resulting in a backlog of over 400,000 applications. *Id.* ¶ 9.

To deter people from filing frivolous asylum applications for the purpose of obtaining EAD, the USCIS Asylum Division introduced the "Last-In, First-Out" ("LIFO") system in 1995. Lafferty Decl. ¶ 11. Under LIFO, "the Asylum Division scheduled recently filed asylum applications for interview ahead of older applications." *Id.* ¶ 11. The goal of LIFO was to "put applicants on notice that filing asylum applications primarily to obtain EAD carried a significant risk that their cases would be completed quickly and that their efforts to obtain an EAD would be fruitless." *Id.* ¶ 11. Over time, LIFO proved successful, as the backlog reduced from approximately 464,100 applications in 1995 to 4,200 applications by the end of 2013. *Id.* ¶ 12.

LIFO, however, lost its effectiveness following a substantial increase in nationals from Mexico starting in 2013. Lafferty Decl. ¶¶ 13, 21. Because many of these nationals feared persecution if they were to return to their country of origin, USCIS was required to conduct

credible fear and reasonable fear screenings.  *Id.* ¶¶ 13–14.  Credible fear and reasonable fear screenings take substantial USCIS resources because reasonable fear screenings must be completed within 10 days of referral, and "a noncitizen subject to the credible fear process 'shall be detained' pending a final determination of their claim."  *Id.* ¶¶ 15–16; *see also* 8 C.F.R. § 201.31; 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).  In 2013, there was also a substantial increase in unaccompanied children seeking asylum in the United States, which required immediate USCIS effort.  *Id.* ¶ 19.  Because USCIS resources were diverted to these time-sensitive matters, asylum applications were no longer adjudicated with the same speed, the deterrence effect of LIFO weakened, and the number of frivolous applications again surged.  *Id.* ¶¶ 20–21.  To prevent long adjudicative wait times for asylum applicants, USCIS returned to the "First-in, First-Out" ("FIFO") system—"under which asylum interviews were scheduled in the order that the applications were filed"—in December 2014.  *Id.* ¶ 21.

The return of FIFO had grave consequences for the asylum application backlog.  Lafferty Decl. ¶ 22.  As such, USCIS announced that it was returning to the LIFO system in January 2018. *Id.* ¶ 24.  Although "receipts immediately fell upon the return to LIFO scheduling," USCIS faced "a crisis-level backlog of 311,000 pending asylum applications"; "the backlog had grown more than 1,750 percent during the three years of FIFO scheduling."  *Id.* ¶¶ 26–27, 34 Charts 1 & 2. Under the reinstated LIFO system, asylum interviews are scheduled in the following order: (1) applications that were scheduled for an interview, but the applicant rescheduled; (2) applications pending fewer than 21 days; and (3) "all other pending applications, starting with newer filings and working back toward other filings."[1]  *Id.* ¶ 25; Declaration of Elizabeth D. Kurlan, Dkt. No. 13-3 ¶ 3, Ex. 2.

In 2022 and 2023, the asylum application backlog began reaccumulating due to a surge in applicants from Colombia, Cuba, Haiti, Nicaragua, and Venezuela.  Lafferty Decl. ¶¶ 35–37.  In 2022 alone, USCIS received 240,787 affirmative asylum applications—excluding credible fear and reasonable fear filings—and a sustained backlog of 572,022 applications.  *Id.* ¶ 34 Charts 1 &

---

[1] Kullab's application is under the third category.

United States District Court
Northern District of California

2. By the end of the third quarter of 2024, there was a total backlog of 1,252,235 applications. *Id.* ¶ 34 Chart 2. Further, the influx of nationals from these five countries led to more erroneously filed applications, and administrative closures could only be conducted manually.[2] *Id.* ¶¶ 38–39.

Other high priority matters and constraints have affected USCIS's ability to reduce the asylum application backlog. As of September 2021, USCIS is required to adjudicate applications from Afghan nationals on a mandatory, nondiscretionary timeline. Lafferty Decl. ¶ 43. Under Operation Allies Welcome ("OAW"), Congress required "USCIS to interview those applicants within 45 days of filing and . . . to complete final adjudication of their applications within 150 days of filing." *Id.* ¶ 43. In a case concerning OAW, the parties' settlement agreement "impose[d] mandatory deadlines by which USCIS must adjudicate set percentages" of those applications. *Id.* ¶ 45. To remain compliant with the settlement agreement, "the Asylum Division must prioritize the adjudication" of these applications. *Id.* ¶ 45. Further, the USCIS budget, as set by Congress, is inconsistent, and has only been used to support limited efforts to fund payroll and technology initiatives. *Id.* ¶ 52. The budget is too unreliable to staff additional asylum officers. *Id.* ¶ 52. Additionally, USCIS has been a party to thousands of lawsuits filed by asylum applicants looking to compel adjudication—in 2023, approximately 4,300 lawsuits were filed. *Id.* ¶ 58. Managing and litigating these cases also requires substantial USCIS time and funding. *Id.* ¶¶ 59–60.

USCIS affords certain benefits and protections to applicants while their application is pending. Applicants can file for EAD 150 days after their application was filed, and they can renew the EAD as their application pends. Lafferty Decl. ¶ 8. Applicants can also apply for advance parole if they need to travel outside of the United States while their application is pending. Declaration of Danielle Lehman, Dkt. No. 13-2 ¶ 18. However, during the pendency of their application, asylum applicants are "lawfully present" without threat of removal and for the purposes of government benefits. Lafferty Decl. ¶ 8.

---

[2] As of mid-2024, USCIS software automatically closes cases when USCIS lacks jurisdiction. Lafferty Decl. ¶¶ 39–40. Abandoned cases, withdrawn cases, and cases where applicants failed to a file a notice to appear, however, must still be manually closed by asylum officers. *Id.* ¶ 41.

4

1    USCIS asserts that it continues to implement initiatives to reduce the backlog.  For

2    example, USCIS is now adjudicating asylum applications on a second, chronological track in

3    addition to LIFO.  Lafferty Decl. ¶¶ 31–32.  On this second track, "USCIS assigns some of its

4    asylum officers to complete affirmative asylum cases pending in the backlog, starting with the

5    oldest cases and working forward."  *Id.* ¶ 32.

6    **II.    KULLAB'S CASE**

7        On November 3, 2020, Kullab filed an asylum application with USCIS.  Compl., Dkt.

8    No. 1 ¶ 1; Lehman Decl. ¶ 14.  USCIS has still not scheduled Kullab's asylum interview.  Compl.

9    ¶ 1; Lehman Decl. ¶ 15.  Kullab filed this action on July 9, 2024, against defendants—DHS,

10   USCIS, and three individuals in their official capacities: (1) Mayorkas, the Secretary of DHS, (2)

11   Jaddou, the Director of USCIS, and (3) Bardini, the Director of the San Francisco Asylum Office.

12   Compl. ¶¶ 7–11.  In her Complaint, Kullab requests "an order compelling Defendants, and those

13   acting under them, to take all appropriate action to adjudicate Plaintiff's asylum claim without

14   further delay."  *Id.* ¶ 2.

15       Defendants move for summary judgment, making two arguments: (1) "the Court lacks

16   jurisdiction over Plaintiff's mandamus and APA claims to the extent these claims assert that

17   defendants have breached a mandatory duty to adjudicate an asylum application within a specific

18   timeframe;" and (2) "USCIS has not unreasonably delayed the adjudication of Plaintiff's asylum

19   application as a matter of law, as several courts in this District have recently held in similar cases

20   in which the applications have been pending as long or nearly as long as Plaintiff's."  Mot., Dkt.

21   No. 13 at 2.

22                              **LEGAL STANDARD**

23       Summary judgment on a claim or defense is appropriate "if the movant shows that there is

24   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

25   law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

26   the absence of a genuine issue of material fact with respect to an essential element of the

27   non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

28   persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

*United States District Court*
*Northern District of California*

5

United States District Court
Northern District of California

1    made this showing, the burden then shifts to the party opposing summary judgment to identify

2    "specific facts showing there is a genuine issue for trial." *Id.*  The party opposing summary

3    judgment must then present affirmative evidence from which a jury could return a verdict in that

4    party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

5                                        **DISCUSSION**

6    **I.    MANDAMUS ACT**

7          "The district courts shall have original jurisdiction of any action in the nature of mandamus

8    to compel an officer or employee of the United States or any agency thereof to perform a duty

9    owed to the plaintiff."  28 U.S.C. § 1361.  "Mandamus is an extraordinary remedy and is available

10   to compel a federal official to perform a duty only if: (1) the individual's claim is clear and

11   certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be

12   free from doubt, and (3) no other adequate remedy is available." *Patel v. Reno*, 134 F.3d 929, 931

13   (9th Cir. 1997) (citing *Azurin v. Von Raab*, 803 F.2d 993, 995 (9th Cir. 1986)).  "Even if the test is

14   met, the district court still retains the discretion to deny relief." *Johnson v. Reilly*, 349 F.3d 1149,

15   1154 (9th Cir. 2003).

16         Defendants argue that Kullab's Mandamus cause of action fails because 8 U.S.C.

17   § 1158(d)(7) expressly prohibits a private right of action to enforce the timelines set forth in

18   § 1158(d)(5)(A)(ii) and (iii).  Mot. at 11–12; Reply, Dkt. No. 20 at 2–3.  Because the INA does not

19   provide for a private right of action, defendants argue that Kullab's claim is not clear and certain

20   as required, failing the first prong of the test.  Mot. at 12; Reply at 3.  Kullab does not discuss the

21   factors for Mandamus relief in her Opposition. *See generally* Oppo., Dkt. No. 16.  Instead, Kullab

22   makes an argument for APA jurisdiction under her Mandamus subheading, which I will address

23   below. *Id.* at 3–5.

24         Title 8 subsection 1158(d)(7) of the United States Code instructs, "Nothing in this

25   subsection shall be construed to create any substantive or procedural right or benefit that is legally

26   enforceable by any party against the United States or its agencies or officers or any other person."

27   8 U.S.C. § 1158(d)(7).  Congress therefore prohibited applicants from bringing private rights of

28   action to enforce the suggested INA adjudication timetables set forth in subsections (d)(5)(A)(ii)

                                              6

and (iii). *See* 8 U.S.C. § 1158(d)(5)(A)(ii)–(iii) (requiring, "in the absence of exceptional circumstances," interviews to be scheduled within 45 days of filing and final adjudication to be completed within 180 days of filing). Courts in this District have consistently held that the INA's prohibition of private rights of action precludes claims for Mandamus relief seeking to force adjudication of asylum applications. *See e.g.*, *Reyes Briseda v. Lehman*, No. 23-cv-00495-TSH, 2024 WL 2112864, at *3 (N.D. Cal. May 8, 2024) (collecting cases); *see also Kurt v. Mayorkas*, No. 24-cv-02792-SK, 2024 WL 5161950, at *3 (N.D. Cal. Dec. 18, 2024); *DeCampos v. United States Citizenship and Immigration Services*, No. 23-cv-03434-NC, 2024 WL 671622, at *2 (N.D. Cal. Jan. 18, 2024); *Denisov v. Mayorkas*, No. 23-cv-06442-SI, 2024 WL 3522047, at *4 (N.D. Cal. July 23, 2024); *Su v. Mayorkas*, 698 F. Supp. 3d 1168, 1176 (N.D. Cal. 2023).

Defendants' motion for summary judgment as to the Mandamus Act claim is GRANTED.

## II.    JURISDICTION

Defendants argue that I lack jurisdiction to hear this matter because "the APA does not provide an independent basis for subject matter jurisdiction." Mot. at 13; Reply at 3. Defendants also argue that 5 U.S.C. § 706(1) of the APA—allowing reviewing court to "compel agency action"—only applies "when the agency has a discrete, legally required duty" and shall be limited to "compelling agency actions required by law." Mot. at 13; Reply at 3. USCIS contends that the APA claim fails because INS does not have a discrete, legally required duty to act by law under the INA as 8 U.S.C. § 1158(d)(5)(A) allows flexibility in the adjudication of asylum application for "exceptional circumstances" and 8 U.S.C. § 1158(d)(7) prohibits private rights of action under the INA. Mot. at 13; Reply at 4. In opposition, Kullab claims that USCIS does not "have discretion over whether to adjudicate an application" and, instead, has a discrete and legally required duty to adjudicate her application, and that this duty is sufficient to establish jurisdiction. Oppo. at 3–5.

Under 5 U.S.C. § 706(1), the APA's scope of review statute, reviewing courts shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In *Norton v. Southern Utah Wilderness Alliance*, the United States Supreme Court clarified that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a

7

*discrete* agency action that it is *required to take.*"  542 U.S. 55, 64 (2004) (emphasis in original).

As other courts in the circuit have held, adjudicating asylum applications *is* a discrete agency

action that USCIS is required to take.  "The use of the word 'shall' with respect to adjudication of

an asylum application and the time frame for conducting an interview for an asylum application in

the statute and regulations demonstrates that the adjudication of asylum applications is not a

discretionary act." *Hui Dong v. Cuccinelli*, No. CV 20-10030-CBM-(PLAx), 2021 WL 1214512,

at *2 (C.D. Cal. Mar. 2, 2021); *Ou v. Johnson*, No. 15-cv-03936-BLF, 2016 WL 7238850, at *3

(N.D. Cal. Feb. 16, 2016) ("[P]rocessing Ou's asylum application was a 'discrete agency action

that [USCIS was] required to take.'").[3]

I recognize that other district courts in this circuit have held differently; that "to the extent

[a] Plaintiff is attempting to enforce the timing guidelines in 8 U.S.C. § 1158(d)(5)(A), the Court

lacks subject matter jurisdiction."  *See Teymouri v. U.S. Citizenship and Immigration Services*,

No. CV 22-7689 PA (JCx), 2022 WL 18717560, at *3 (C.D. Cal. Jan. 31, 2022); *see also Zhu v.

Cassna*, No. 19-cv-9698 PA (JPRx), 2019 WL 3064458, at *3 (C.D. Cal. Apr. 22, 2019); *Ghali v.

Radel*, No. 18-cv-0508-AJB-RBB, 2019 WL 1429583, at *2 (S.D. Cal. Mar. 29, 2019).  In this

District, in *DeCampos v. United States Citizenship and Immigration Services*, the court held that

although USCIS is required to *eventually* adjudicate an application, the "exceptional

circumstances" language of 8 U.S.C. § 1158(d)(5)(A) does not require USCIS to act within a

certain time period and, therefore, USCIS has discretion to act.  2024 WL 671622, at *3.  That

said, I agree with the majority of courts from this District that have considered the issue; the

adjudication of asylum applications is not a discretionary act and there is jurisdiction under the

APA to consider Kullab's claim on the merits.

The INA's prohibition of private rights of action in 8 U.S.C. § 1158(d)(7) does not

preclude judicial review.  As the court in *Varol v. Radel*, 420 F. Supp. 3d 1089 (S.D. Cal. 2019)

---

[3] *See also Denisov*, 2024 WL 3522047, at *3 (holding that courts may review APA claims because the no private right of action provision does not negate the discrete agency action required of USCIS); *Su*, 698 F. Supp. 3d at 1175 (N.D. Cal. 2023) (same); *Reyes Briseda*, 2024 WL 2112864, at *4 (same); *Kurt*, 2024 WL 5161950, at *3; *Cai v. Mayorkas*, No. 23-cv-02697-LB, Dkt. No. 22 at 4–5 (same).

United States District Court
Northern District of California

explained, "unlike other subsections of the INA, § 1158(d)(7) does not expressly preclude judicial review," and "[h]ad Congress intended § 1158(d)(7) to be a jurisdiction-stripping provision, it would have adopted the express language found in [other subsections of § 1158]." *Id*. at 1096. Moreover, "if there was any doubt as to Congressional intent, the well-established presumption favors judicial review." *Id*. (citation omitted).  Courts in this District have followed *Varol* and reached the same conclusion.  *See e.g.*, *Denisov*, 2024 WL 3522047, at *3; *Su*, 698 F. Supp. 3d at 1175; *Reyes Briseda*, 2024 WL 2112864, at *4.

### III.    MERITS OF THE ADMINISTRATIVE PROCEDURE ACT CLAIM

Kullab asserts that the adjudication of her asylum application has been unreasonably delayed and, under 5 U.S.C. § 706(1), seeks an "order compelling Defendants . . . to take all appropriate action to adjudicate Plaintiff's asylum claim without further delay."  Compl. ¶ 2. Defendants argue they are entitled to summary judgment on the APA claim because, under *Telecommunications Research and Action Center v. F.C.C.* ("*TRAC*"), 750 F.2d 70 (9th Cir. 1984), the delay is not unreasonable as a matter of law.  Mot. at 14.

The Ninth Circuit applies the *TRAC* factors to determine whether agency delays are unreasonable.  *See Independence Mining Co. v. Babbitt*, 105 F.3d 502, 507–11; *see also Brower v. Evans*, 257 F.3d 1058, 1068 (9th Cir. 2001) (citations omitted).  Under *TRAC*, the reasonableness of an agency's delay is evaluated considering:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

750 F.2d at 80 (citations omitted).  The *TRAC* factors weigh in favor of defendants.

United States District Court
Northern District of California

### A.     Rule of Reason

"[T]he time agencies take to make decisions must be governed by a 'rule of reason.'" *Id.*; *see also Ray v. Cuccinelli*, No. 20-cv-06279-JSC, 2020 WL 6462398, at *8 (N.D. Cal. Nov. 3, 2020). "The most important *TRAC* factor is the first factor, the 'rule of reason,' though it, like others, is not itself determinative." *Denisov*, 2024 WL 3522047, at *5 (quoting *In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017)). The first *TRAC* factor, rule of reason, weighs in favor of defendants.

Defendants argue that the rule of reasons weighs in their favor because USCIS identified LIFO as a rule of reason for adjudicating asylum applications and "[c]ourts throughout the country have found the LIFO policy is a rule of reason that satisfies the first *TRAC* factor." Mot. at 15 (citing *Dang v. Mayorkas*, No. 23-cv-02212-LB, 2023 WL 8007993, at *4 (N.D. Cal. Nov. 17, 2023); *Su*, 698 F. Supp. 3d at 1179); Reply at 5. Defendants contend that "USCIS's three-tiered LIFO scheduling system is both purposeful and rational" because "USCIS re-implemented the LIFO scheduling policy in response to the crisis-level backlog that accrued during the years in which FIFO was in effect," and it is aimed at discouraging the filing of frivolous applications and manage the massive backlog. Mot. at 16; Reply at 6; Lafferty Decl. ¶¶ 24–27.

In opposition, Kullab argues that defendants failed to address her assertion that "because the number of new asylum claims filed on a daily basis is larger than the number of asylum interviews scheduled per day, [Kullab's] application will never be scheduled for an interview or fully adjudicated under Defendants' scheduling policies." Oppo. at 6; *see also* Compl. ¶¶ 17, 21–22, 27–28. That is not true.

There are two mechanisms by which USCIS addresses asylum applications: LIFO and a second, chronological track. Lafferty Decl. ¶¶ 31–32; *see also* Kurlan Decl., Ex. 2, USCIS Affirmative Asylum Interview Scheduling, Dkt. No. 13-4 at 5 ("On the second track, USCIS assigns some of its asylum officers to complete affirmative asylum applications pending in the backlog, starting with the oldest applications and working forward. This permits some of the oldest pending applications to be completed in chronological order."). Where both interview

1    tracks are operating concurrently—as defendants declare they are now, Lafferty Decl. ¶ 32—

2    Kullab's asylum application will eventually be adjudicated.

3         Considering LIFO alone, I agree with defendants and the other courts in this District: LIFO

4    is a sufficient rule of reason.  *See e.g.*, *Denisov*, 2024 WL 3522047, at *5; *Su*, 698 F. Supp. 3d at

5    1177; *Reyes Briseda*, 2024 WL 2112864, at *5; *Kurt*, 2024 WL 5161950, at *4; *Dang*, 2023 WL

6    8007993, at *4; *Zheng v. Mayorkas*, No. 4:23-cv-02707-KAW, 2024 WL 130157, at *6 (N.D. Cal.

7    Jan. 11, 2024).  "LIFO is 'a sensible administrative response to the problem of increased frivolous,

8    fraudulent, or meritless asylum filings that increase the overall caseload and extend wait periods

9    for all applicants.'"  *Varol*, 420 F. Supp. 3d at 1097.  Defendants have shown that LIFO was a

10   reasonable response to the substantial backlog and frivolous applications caused by FIFO.  *See*

11   *generally* Lafferty Decl.; *see also* Kurlan Decl., Ex. 4, February 1, 2000, DOJ New Release, Dkt.

12   No. 13-4 at 27–28.

13        Although Congress allows for delays in "exceptional circumstances," this does not mean

14   that all delays are necessarily excused.  "There does come a point where [a] seemingly infinite

15   delay . . . becomes untethered from any discernable 'rule of reason.'"  *Denisov*, 2024 WL

16   3522047, at *6 (citing *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1072 (N.D. Cal. 2014)).  "District

17   courts in this circuit 'have generally found that immigration delays in excess of five, six, seven

18   years are unreasonable, while those between three to five years are often not unreasonable.'"  *Id.*

19   (quoting *Yavari v. Pompeo*, 2:19-cv-02524-SVW-JC, 2019 WL 6720995, at *8 (C.D. Cal. Oct. 10,

20   2019)).  Kullab has been waiting for less than five years.  The first *TRAC* factor favors defendants.

21        **B.    Congressional Timetable**

22        "[W]here Congress has provided a timetable or other indication of the speed with which it

23   expects the agency to proceed in the enabling statute, that statutory scheme may supply content for

24   this rule of reason."  *TRAC*, 750 F.2d at 80.  Although Congress provided a clear timetable for

25   adjudicating asylum applications, Congress also affords USCIS discretion to deviate from the

26   timeframe in "exceptional circumstances."  Under 8 U.S.C. § 1158(d)(5)(A)(ii), "*in the absence of*

27   *exceptional circumstances*, the initial interview or hearing on the asylum application shall

28   commence not later than 45 days after the date an application is filed."  8 U.S.C.

United States District Court
Northern District of California

§ 1158(d)(5)(A)(ii) (emphasis added).  Likewise, "*in the absence of exceptional circumstances*, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed."  8 U.S.C. § 1158(d)(5)(A)(iii) (emphasis added).  Courts in this District have explained that because Congress included "exceptional circumstances" clauses in the statutes, "'the timing requirements are not mandatory' and 'do[] not outweigh the rule of reason which supports the USCIS policies which have caused the challenged delays.'"  *Su*, 698 F. Supp. 3d at 1177–78 (quoting *Varol*, 420 F. Supp. 3d at 1097).

Defendants have shown that the backlog, administrative closures, mandated interviews, funding, and litigation have all contributed to USCIS's delays.  *See* Lafferty Decl. ¶ 34–52, 57–60. Those circumstances are challenging, no doubt.  Unfortunately, in the context of our immigration system over the last thirty years they are more the norm than not.  At some point relatively soon, the described "exceptional" circumstances will not excuse the continued delay in adjudicating Kullab's application.  But for the moment, the second factor is neutral.

### C.    Human Health and Welfare, and Nature of Interests

The third and fifth *TRAC* factors are often addressed together, as the parties do in their briefing.  Mot. at 20–22; Oppo. at 7–8; Reply at 9–10; *see also Independence Mining*, 105 F.3d at 509 (referring to the third and fifth factors as "overlapping").  These factors contemplate "whether human health and welfare are at stake and the nature and extent of the interests prejudiced by delay."  *Yan v. Director of Los Angeles Asylum Office for the United States Citizenship and Immigration Services*, No. 2:22-cv-05846-ODW (MRWx), 2023 WL 4053410, at *5 (C.D. Cal. June 16, 2023) (holding that generalized "fear, despair, preoccupation and uncertainty" do not satisfy these factors).

To support her allegations of harm by USCIS's failure to adjudicate her asylum application, Kullab points to numerous alleged injuries in her Complaint:

> Plaintiff's (1) inability to secure benefits of stable immigration status; (2) inability to obtain lawful permanent residence and U.S. Citizenship; (3) inability to apply for jobs that require permanent residence; (4) inability to benefit from federal financial aid; (5) limited ability to leave and reenter the United States; (6) inability to petition for family members to join her; and (7) mental stress and suffering that

United States District Court
Northern District of California

prevents Plaintiff from finding any peace of mind.

Oppo. at 7; *see also* Compl. ¶ 18.  Defendants argue that the third and fifth factors weigh in their favor because Kullab "has not identified any specific risk to her health and welfare," as opposed to harms that are "equally applicable to all asylum applicants" that do not "present a compelling health and welfare rationale for advancing *Plaintiff's* application."  Mot. at 20 (emphasis in original).

I do not doubt that this delayed adjudication is stressful.  That harm is not unique to Kullab, however.  Courts in this District have consistently held that when plaintiffs allege general harms experienced by all asylum applicants, these factors do not tip in favor of an applicant.  *See Su*, 698 F. Supp. 3d at 1178 (citing *Varol*, 420 F. Supp. 3d at 1097); *see also Denisov*, 2024 WL 3522047, at *6.

To ameliorate general harms from a delay in processing asylum applications, certain protections and benefits are available to applicants awaiting adjudication.  For example, asylum seekers are allowed to apply for employment authorization ("EAD") 150 days after their applications are submitted by filing a Form I-765.  Lehman Decl. ¶ 8.  According to USCIS records, Kullab was granted EAD on December 8, 2021.  Lehman Decl. ¶¶ 19–20.  Kullab has since renewed her EAD, has a valid EAD through October 15, 2029, and "is eligible to renew her employment authorization in 5-year increments for the entire pendency of her asylum application."  Lehman Decl. ¶ 20.

In short, Kullab is "worse off than she would be if her application were adjudicated and granted, but she is better off than she would be if her application were adjudicated and denied." *Kurt*, 2024 WL 5161950, at *5; *Reyes Briseda*, 2024 WL 2112864, at *6 (recognizing that ability to work and stay in the United States while applications are pending do not tip scales to plaintiffs and instead favor defendants).  Because Kullab does not allege injury beyond the general harms experienced by all asylum applicants and is benefitted by her ability to stay and work in the United States while her application is pending, the third and fifth *TRAC* factors favor defendants.

**D.    Effect of Expediting Action**

Under the fourth *TRAC* factor, "the court should consider the effect of expediting delayed

United States District Court
Northern District of California

action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80.  Here, the competing priorities are other asylum applications, as well as urgent caseloads that require USCIS action with a mandatory or expedited timeline.  Lafferty Decl. ¶¶ 13–20, 33–37, 42–46; Lehman Decl. ¶¶ 5–8.

Defendants argue that compelling adjudication of Kullab's application would not address the pervasive asylum application backlog.  Mot. at 22; Reply at 11.  Rather, it would "simply advance the adjudication of Plaintiff's application to the detriment of other applicants who are waiting in the queue."  Mot. at 22 (citing *Esquivel v. Lehman*, No. 3-cv-02930-AGT, 2024 WL 2242441, at *1 (N.D. Cal. Apr. 16, 2024)).  In opposition, Kullab claims that she is not looking to skip the line.  Oppo. at 8.  Kullab instead argues that (1) there is no evidence that others have waited longer for their application to be adjudicated than she has; (2) because defendants place others ahead of her in line, it would not be unjust for her application to be placed at the front of the queue to restore her place in line; (3) defendants have not cited cases discussing infinite delay, as she alleges here; and (4) the court should not defer from judicial review "where an agency entirely abdicates its duty to act."  *Id.*

The evidence shows that her application will be adjudicated in light of the two-track interview scheduling system that USCIS currently employs.  Lafferty Decl. ¶¶ 31–32.  Although Kullab contends that the LIFO system likely will not reach her application, the second track—the chronological track—is designed to reduce the backlog by adjudicating the longest pending applications.  *Id.*  Further, defendants have identified many priorities that require resources that could be impacted by putting Kullab or other applicants to the front of the line.  These priorities include reducing the backlog, manually closing abandoned and withdrawn applications, adjudicating Afghan nationals' asylum applications under OAW, and addressing civil lawsuits filed against USCIS.  *Id.* ¶¶ 34–37, 41, 45, 59–60.

USCIS has numerous, competing priorities with strict deadlines, and it would be unjust to move Kullab's application to the front of the line at this time.  As other courts in this District have held, "[t]his factor weighs *heavily* in favor of the Defendants."  *Kurt*, 2024 WL 5161950, at *5 (emphasis added); *see also Reyes Briseda*, 2024 WL 2112864, at *7; *Su*, 698 F. Supp. 3d at 1178.

14

**E.    Impropriety**

The final *TRAC* factor, impropriety, is neutral.  "The court need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *TRAC*, 750 F.2d at 80 (citation omitted).  Defendants argue that "delayed adjudication is due to genuine and appropriate attempts" to adjudicate asylum applications.  Mot. at 23.  Kullab does not claim impropriety by defendants.  Oppo. at 9.  The weight of authority in this District finds that where the "[p]laintiff cites no impropriety by Defendants, and the Court has found none," then "this factor is neutral."  *Su*, 698 F. Supp. 3d at 1179; *Denisov*, 2024 WL 3522047, at *7 ("[a]lthough the presence of an intentional delay would strongly support [p]laintiff's argument, the opposite is not necessarily true for [d]efendants.").

## CONCLUSION

As repeatedly recognized by courts in this District, "there is a significant backlog that is inarguably a humanitarian and bureaucratic crisis, but it is a crisis that this Court is not well-placed to address."  *Kurt*, 2024 WL 5161950, at *1 (citation omitted); *Esquivel*, 2024 WL 2242441, at *1.  With sympathy for Kullab's circumstances, the *TRAC* factors either weigh in favor of defendants or are neutral.  Defendants' motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Dated: March 25, 2025

William H. Orrick
United States District Judge